**PLAINSCAPITAL BANK, Petitioner,**

v.

**William MARTIN, Respondent**

No. 13–0337

Supreme Court of Texas.

Argued September 18, 2014

OPINION DELIVERED: March 27, 2015

Rehearing Denied June 5, 2015

Matthew Ploeger, Law Office of Matthew Ploeger, Austin, Craig Zieminski, Matthew Walter Moran, Thomas S. Leatherbury, Vinson & Elkins LLP, Dallas, for petitioner.

Lawrence Fischman, Robert B. Cousins Jr., Glast Phillips & Murray, P.C., Dallas, for respondent.

B. Scott Daugherty, Texas Bankers Association, Austin, John Fleming, Nacogdoches, Karen M. Neeley, Cox Smith Matthews, Inc., Austin, for amici curiae Independent Bankers Association of Texas.

Justice Johnson delivered the opinion of the Court, in which Chief Justice Hecht, Justice Green, Justice Willett, Justice Lehrmann, Justice Devine, and Justice Brown joined.

After William Martin defaulted on a note, PlainsCapital Bank foreclosed its contractual deed of trust lien on property securing the note. The bank was the highest bidder at the foreclosure sale and bought the property for less than the secured debt. Martin sued the bank, asserting, in part, that the property's fair market value on the date of foreclosure was in excess of the foreclosure sales price and Texas Property Code § 51.003 required the bank to offset the excess against his debt. The trial court determined that § 51.003 did not apply and rendered judgment for the bank on its counterclaim for damages and attorney's fees. The court of appeals reversed and remanded to the trial court. It held that (1) § 51.003 applied, (2) the term "fair market value" as used in § 51.003 is the historical willing-seller/willing-buyer definition of fair market value, and (3) although legally insufficient evidence supported the trial court's findings as to the Bank's damages, Martin did not conclusively prove his affirmative defense, leaving a factual question unsettled. The appeals court remanded the case to the trial court for further proceedings.

We agree with the court of appeals that § 51.003 applies, but disagree that the term "fair market value" as used in that section equates to the historical willing-seller/willing-buyer construct. We reverse the judgment of the court of appeals and

remand the case to that court for further proceedings in accordance with this opinion.

## I. Background

William Martin borrowed money from PlainsCapital Bank in September 2006 pursuant to a construction loan agreement and promissory note. He borrowed the money to build a house that he intended to sell and secured his obligations to the bank by executing a deed of trust on the lot and improvements to it (the property). After Martin built the house, he was unable to sell it and in March 2008 defaulted on his note, prompting PlainsCapital to begin foreclosure proceedings. The bank consulted a real estate broker who estimated the property's fair market value as $770,000, with the broker also noting that the local real estate market was depressed and houses in the area were normally taking 273 days to sell. Based on its past experience, PlainsCapital estimated that its costs to hold and dispose of the property would be thirty percent of the property's value, or $231,000.

The foreclosure sale was held on June 3, 2008. Martin does not contest the amount that the bank says he owed on that date, which was $770,757.45 in principal, $15,791.02 in interest, and $2,705.52 in attorney's fees for the foreclosure. PlainsCapital purchased the property for its bid of $539,000—the difference between the broker's estimate of the property's value and the bank's estimated holding and disposition costs of $231,000. A week after purchasing the property, PlainsCapital had it appraised. The appraiser estimated the fair market value of the property as $825,000 and opined that the value would have been the same during the preceding week when the foreclosure sale took place.

Although PlainsCapital promptly marketed the property, it did not sell. A re-appraisal in July 2009 valued the property at $575,000 and noted a general decline in property values from the preceding year. PlainsCapital finally sold the property in September 2009 for $599,000.

Shortly after the foreclosure sale Martin sued PlainsCapital on various theories, including fraud and wrongful foreclosure. The bank counterclaimed for damages from Martin's breach of the construction loan agreement, note, and deed of trust, and also for attorney's fees. Martin subsequently dismissed his affirmative claims, but maintained that Property Code § 51.003 required an offset of the property's fair market value on the date of the foreclosure sale against any judgment in favor of PlainsCapital. He alleged that the fair market value was $825,000. The case was tried to the court in January 2010, several months after PlainsCapital sold the property.

The trial court first considered whether Texas Property Code § 51.003 applied. Section 51.003 provides as follows:

(a) If the price at which real property is sold at a foreclosure sale under Section 51.002 [Sale of Real Property Under Contract Lien] is less than the unpaid balance of the indebtedness secured by the real property, resulting in a deficiency, any action brought to recover the deficiency must be brought within two years of the foreclosure sale and is governed by this section.

(b) Any person against whom such a recovery is sought by motion may request that the court in which the action is pending determine the fair market value of the real property as of the date of the foreclosure sale. The fair market value shall be determined by the finder of fact after the introduction by the parties of competent evidence of the value. Competent evidence of value may include, but is not limited to, the following:

(1) expert opinion testimony; (2) comparable sales; (3) anticipated marketing time and holding costs; (4) cost of sale; and (5) the necessity and amount of any discount to be applied to the future sales price or the cashflow generated by the property to arrive at a current fair market value.

(c) If the court determines that the fair market value is greater than the sale price of the real property at the foreclosure sale, the persons against whom recovery of the deficiency is sought are entitled to an offset against the deficiency in the amount by which the fair market value, less the amount of any claim, indebtedness, or obligation of any kind that is secured by a lien or encumbrance on the real property that was not extinguished by the foreclosure, exceeds the sale price. If no party requests the determination of fair market value or if such a request is made and no competent evidence of fair market value is introduced, the sale price at the foreclosure sale shall be used to compute the deficiency.

Tex. Prop. Code § 51.003.

PlainsCapital argued that the language of § 51.003(a) limits § 51.003's application to cases in which "the" deficiency sought from the borrower is the precise difference between the foreclosure sale price and the outstanding secured obligations. That being so, the Bank reasoned, the statute is inapplicable to its claim against Martin because the bank was not seeking a deficiency based on "the" foreclosure sale price; rather, it was seeking a deficiency based on the price for which it subsequently sold the property.

Siding with PlainsCapital, the trial court held that § 51.003 did not apply. It held a hearing, made and entered findings of fact and conclusions of law, and rendered judgment for the bank for $332,927.27 in damages—including holding costs and costs of sale damages per the construction loan agreement and deed of trust—and $127,558.24 in post-foreclosure attorney's fees. Additionally, however, the trial court concluded that even if § 51.003 applied, Martin would not be entitled to an offset because the fair market value under § 51.003(b) was less than the $539,000 that PlainsCapital paid at the foreclosure sale. In its findings of fact underlying that conclusion, the trial court began with the $599,000 "future price of the property" for which the bank subsequently sold it. *See* Tex. Prop. Code § 51.003(b)(5). From that amount, the court subtracted the bank's actual holding costs and costs of sale, which it found were $75,376.41 and $45,907.94, respectively, and which it concluded § 51.003(b)(3) and (4) authorized it to deduct.

The court of appeals reversed. *Martin v. PlainsCapital Bank*, 402 S.W.3d 805, 811–12 (Tex.App.–Dallas 2013). It held that Martin's deficiency must be calculated pursuant to § 51.003, and agreed with other courts of appeals[1] that the term "fair market value" as used in § 51.003 was intended by the Legislature to have the "historical" definition: the price the property would bring when offered for sale by a seller desiring to sell, but not obliged to do so, and bought by a purchaser desiring to buy, but under no necessity of doing so. *Id.* The court further held that the evidence was legally insufficient to support

---

1. *Cabot Capital Corp. v. USDR, Inc.*, 346 S.W.3d 634, 639 (Tex.App.–El Paso 2009, pet. denied) (applying historical definition in § 51.003 suit) (citing *City of Pearland v. Alexander*, 483 S.W.2d 244, 247 (Tex.1972)); *Pres-*

*ton Reserve, L.L.C. v. Compass Bank*, 373 S.W.3d 652, 658 (Tex.App.–Houston [14th Dist.] 2012, no pet.) (citing *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 246 (Tex.1981)).

the finding of $332,927.27 in damages to the bank because the trial court used the actual 2009 resale price of $599,000 to calculate the bank's damages, even though there was no evidence to support linking that amount to the fair market value on the date of the foreclosure sale. *Id.* at 813. The court remanded the case for the trial court to determine the factual issues the appeals court identified, including the property's fair market value on the date of the foreclosure sale. *Id.* The court did not reach the merits of Martin's challenges to the trial court's awarding post-foreclosure holding costs and costs of sale, or attorney's fees. Those parts of the judgment were reversed and remanded along with the rest of the case. *Id.* at 813–14.

As relevant to our analysis, PlainsCapital advances multiple reasons for which it says the court of appeals' judgment should be reversed: (1) § 51.003 is not applicable because it only applies when a deficiency is based on the foreclosure sale price, and the bank did not base its damages claim on that price; (2) even if § 51.003 applies, fair market value under the statute is not the same as the historic definition of fair market value; (3) sufficient evidence supports the trial court's finding as to the property's § 51.003 fair market value on the date of the foreclosure sale; and (4) the trial court properly awarded PlainsCapital its post-foreclosure costs and attorney's fees.[2]

Martin responds: (1) § 51.003 governs all nonjudicial foreclosure deficiency calculations where the lien is contractually created, as it was here; (2) although the statute provides guidance as to what is competent evidence of fair market value, the court of appeals correctly held that the

historic willing-seller/willing-buyer definition of fair market value applies under § 51.003(b); (3) the statute requires that a property's fair market value be determined as of the date of the foreclosure sale, and because the trial court based its calculations of that value on the price for which PlainsCapital later sold the property and the bank's actual expenses, no evidence supported the trial court's finding of value; (4) PlainsCapital is not entitled to post-foreclosure holding and sales costs because Martin no longer retained any interest in the property and he should not be held liable for those costs; and (5) if § 51.003 does not apply and PlainsCapital's post-foreclosure holding and sales costs can be considered in determining a property's fair market value, then the case should be remanded for the court of appeals to consider Martin's challenges to the factual sufficiency of the evidence as to those costs.

## II. Discussion

The issues before us essentially are two: (1) whether § 51.003 applies, and if so, (2) whether it contemplates the use of a post-foreclosure sale price and actual post-foreclosure costs as competent evidence of fair market value. We begin our analysis by considering whether § 51.003 applies.

### A. Section 51.003

Section 51.003, enacted in 1991, adds balance to the mortgagor-mortgagee relationship regarding deficiency judgments. It does so by circumscribing mortgagees' rights to seek deficiency judgments and specifying rights that borrowers[3] have re-

---

2. The Independent Bankers Association of Texas, Texas Bankers Association, and Texas Mortgage Bankers Association submitted an amicus curiae brief in support of PlainsCapital.

3. Section 51.003 refers to "[a]ny person against whom such a [deficiency] recovery is sought." TEX. PROP. CODE § 51.003(b). For ease of reference we primarily refer to such a person as a "borrower." We do not intend by

garding alleged deficiencies. TEX. PROP. CODE § 51.003. Section 51.003 substantively provides that when realty is foreclosed on pursuant to a contract lien and the foreclosure sales price is less than the debt secured, a suit brought against the borrower for "the unpaid balance of the indebtedness secured by the real property" is a suit for a deficiency judgment. *Id.* § 51.003(a). The borrower in such a suit may request that the trial court make a finding as to the fair market value of the realty as of the date of the foreclosure sale. *Id.* § 51.003(b). If the trial court finds the fair market value to be in excess of the foreclosure sales price, then the borrower is entitled to an offset against the deficiency in the amount of the excess (less the amount of any obligations secured by a lien on the property but not extinguished by the foreclosure). *Id.* § 51.003(c).

■ PlainsCapital parses the language of § 51.003(a) and argues that the Legislature's use of the word "the" when referencing deficiency as opposed to "a" deficiency or "any" deficiency limits the application of § 51.003 to deficiencies calculated using the precise foreclosure sales price. *See id.* § 51.003(a) ("any action brought to recover *the* deficiency must be brought within two years of the foreclosure sale and is governed by this section.") (emphasis added). The Bank reasons that use of "the" in the statute makes the section inapplicable to situations such as this where deficiencies are calculated using amounts that vary to some degree from the foreclosure sales price. We disagree.

■ Read as a whole and in context with the remainder of § 51.003, § 51.003(a) provides that whenever a borrower is sued after real property is sold at a foreclosure

the use of that term to imply a limitation on

sale as permitted by and described in § 51.002, and judgment is sought against the borrower because the foreclosure sales price is less than the amount owed, then (1) the suit is for a "deficiency judgment," (2) the suit must be brought within two years of the foreclosure sale, and (3) the suit is governed by § 51.003. But how the amount of the deficiency is calculated is not prescribed by § 51.003(a); rather it is prescribed by § 51.003(b) and (c). Section 51.003(b) affords a borrower the right to request the trial court to determine the fair market value of the property and sets forth how such is to be calculated. Section 51.003(c) prescribes how the amount of the deficiency judgment is to be determined. Under § 51.003(c), if the trial court is not requested to determine the property's fair market value, or if such a request is made but no competent evidence of fair market value is presented, then the foreclosure sales price must be used to calculate the deficiency for purposes of a judgment.

PlainsCapital's proposed interpretation requires reading one word—"the"—out of context from the remainder of § 51.003. It would allow lenders to bypass the carefully crafted deficiency judgment statute with its two-year limitations period and other protections for borrowers and creditors by simply suing the borrower for some amount other than the difference between the amount of the secured debt and the exact foreclosure sales price. The word "the" in the statute referencing a deficiency cannot bear the burden the bank seeks to place on it. PlainsCapital's claim against Martin falls within the provisions of § 51.003 and the court of appeals did not err by so holding.

## B. Section 51.003 Fair Market Value

PlainsCapital contends that even if § 51.003 applies to its claim, the court of

§ 51.003 that is not included in its language.

appeals erred because it equated "fair market value" as that term is used in § 51.003 with the historic measure of fair market value, which is "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex.2001). That error, PlainsCapital asserts, led the appeals court to erroneously reverse the trial court's judgment. Martin responds that the court of appeals was correct in its interpretation of the statute.

When a statute uses a word or phrase without defining it, we presume the Legislature intended the common meaning of the word or phrase to apply. *See City of Houston v. Bates*, 406 S.W.3d 539, 544 (Tex.2013). And when a statute provides a definition for or uses a word or phrase in a particular manner, then courts must apply that definition or manner of use when interpreting the statute. *See TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex.2011). Similarly, we presume the words in a statute are selected with care and we interpret them in a manner that gives meaning to all of them without disregarding some as surplusage. *See id.*; *State v. Shumake*, 199 S.W.3d 279, 287 (Tex.2006).

The Legislature used the phrase "fair market value" in § 51.003 without defining it, so we would ordinarily presume the common meaning of the term applies, as did the court of appeals. However, the statute enumerates categories of evidence and clearly specifies that they may be considered by trial courts in determining fair market value. TEX. PROP. CODE § 51.003(b). For example, § 51.003(b)(5) specifies that a trial court, when calculating the fair market value as of the date of the foreclosure sale, may consider evidence

of "the necessity and amount of any discount to be applied to the future sales price." This factor is forward looking, allowing the trial court to consider the price for which the lender eventually sells the property and to apply a discount, if appropriate, to determine a value as of the foreclosure sale date. It may seem odd to make the price for which the property sold *after* foreclosure an integral component of competent evidence of the property's fair market value on the foreclosure sale date, but that is clearly what the Legislature intended. If it were not, then the relevant part of § 51.003(b)(5) would be nonsensical because an unknown fair market value, which is the value being sought, cannot mathematically be determined by applying a discount to an unknown future sales price, nor could either a prospective buyer or the seller know what the future sales price will be in order to factor it into their decision to buy or sell, regardless of whether a discount factor is applied. And we do not attribute to the Legislature an intent to enact nonsensical statutes. *See* TEX. GOV'T CODE § 311.021(3) ("In enacting a statute, it is presumed that … a just and reasonable result is intended…."); *Hernandez v. Ebrom*, 289 S.W.3d 316, 321 (Tex.2009). Further, if we were to rule the future sales price competent evidence, but only upon a showing of comparable market conditions between the foreclosure sale and the future sale, we would be adding words to § 51.003. We refuse to do that in the absence of clear legislative intent to reach a different result from that reached by applying the plain language of the statute, or to prevent the statute from yielding an absurd or nonsensical result. *See Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex.2001).

Therefore, the enumerated factors in § 51.003(b) will support a fair market value finding under the statute even though

that type of evidence might not otherwise be competent in the common or historical fair market value construct. That being so, the term "fair market value" in § 51.003 does not equate precisely to the common, or historical, definition. Rather, it means the historical definition as modified by evidence § 51.003(b) authorizes the trial court to consider in its discretion, to the extent such evidence is not subsumed in the historical definition.

Which leads to the next issue: did the trial court err in its finding as to the § 51.003 fair market value of the property on the date of the foreclosure sale? The court of appeals held that it did. We disagree.

### C. The § 51.003 Fair Market Value Finding

■ An offset under § 51.003 operates as an affirmative defense to a deficiency claim. *See Moayedi v. Interstate 35/Chisam Rd., L.P.,* 438 S.W.3d 1, 6 (Tex.2014) ("[Section 51.003] provides an offset that otherwise would not be available. In other words, it provides a defense."). Borrowers are entitled to an offset only if they request, prove, and obtain a finding of the property's § 51.003 fair market value as of the date of the foreclosure sale and that value exceeds the foreclosure sales price. TEX. PROP. CODE § 51.003(b), (c). Consequently, in order to receive an offset, Martin bore the burden of proving and obtaining a § 51.003 fair market value finding as of June 3, 2008, that exceeded the $539,000 foreclosure sale price. He contended in the court of appeals, and contends here, both that no evidence supports the trial court's finding of $477,715.65 as the property's § 51.003 fair market value on that date, and that to the contrary, the evidence conclusively establishes the fair market value on that date was $825,000—an amount in excess of his debt. Because

the trial court found against him and he had the burden of proof, to prevail on both his contentions on appeal he must show first, that no evidence supported the trial court's finding, and if there was none, then second, that the evidence conclusively established the property's value was what he alleges—$825,000. *See Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001).

The court of appeals held that no evidence linked the actual price for which PlainsCapital sold the property—$599,-000—to the property's fair market value on the foreclosure sale date, so the trial court's calculations of the § 51.003 fair market value for purposes of determining whether § 51.003 applied and the bank's damages were erroneous. *Martin,* 402 S.W.3d at 813. The court based its determination on its conclusion that the meaning of fair market value in § 51.003 is its historic definition, which we have explained was error. Because the court of appeals determined that the future sales price was not competent evidence under the statute and remanded, it did not address the factual sufficiency challenges Martin raised as to the trial court's § 51.003 fair market value determination. Nor did it conduct either a legal or factual sufficiency review of the trial court's findings of the bank's holding and sale costs.

■ Although the trial court determined that § 51.003 did not apply, it made findings of fact in the event it did. Those findings included the property's § 51.003 fair market value as of the foreclosure sale date as being $477,715.65. It then concluded that § 51.003 did not entitle Martin to an offset because the fair market value was less than the foreclosure sales price of $539,000. The trial court based its fair market value findings on the property's future sales price of $599,000, which § 51.003(b) authorized it to consider. Further, although § 51.003(b) permitted, but

did not require the trial court to do so, it neither applied a discount to the $599,000 sale price, nor deducted the $231,000 that PlainsCapital estimated for holding and sale costs and that led to its bid of $539,000 at the foreclosure sale. Rather, the court subtracted from the sales price the amounts it found to be the bank's actual holding costs and costs of sale. And § 51.003(b) specifies that these may be considered. TEX. PROP. CODE § 51.003(b)(3), (4) ("Competent evidence of value *may* include, *but is not limited to*" anticipated holding costs and costs of sale) (emphasis added). The trial court excluded PlainsCapital's evidence of a discount rate to be applied to the actual sales price, but the bank complains neither of that ruling nor the trial court's failure to apply a discount to the $599,000 sales price, which the statute would have allowed if competent evidence of such discount had been shown. Nor does PlainsCapital complain of the trial court's failing to use the bank's estimated holding and sale costs of $231,000 in calculating the § 51.003 fair market value. Had the trial court done either, the result would have been a lesser number for the § 51.003 fair market value finding than the $477,715.65 figure the trial court found, and Martin still would not have been entitled to an offset.[4] Because the statute both authorizes unknown but anticipated holding costs to be considered as competent evidence and specifies that the trial court may consider but is not limited to considering the listed categories of evidence, we see no reason that the trial court could not, in its discretion, have considered actual holding costs. *See id.* § 51.003(b).

In a single sentence, without challenging any particular expense item or citing au-

thority, Martin contends that the evidence is not legally sufficient to support the trial court's actual holding and sale costs findings because no evidence showed the costs were reasonable and necessary. We disagree.

In regard to the costs, Doug Cook, President of the North Dallas branch of PlainsCapital, testified as to the bank's holding costs and costs of sale. Cook relied on bank business records that listed in itemized detail the holding costs paid by PlainsCapital. He testified that the expenses totaled $75,376.41, and included maintenance items such as utilities, homeowner-association fees, insurance, and $14,136.15 in property taxes. As to sales costs, Cook testified that the bank spent $45,907.04 on real estate commissions and closing costs. We conclude that the trial court did not abuse its discretion by calculating the property's fair market value using the $599,000 future sales price, not applying a discount to reduce the price further, and deducting PlainsCapital's actual holding costs of $75,376.41 and actual sales costs of $45,907.04. *See* TEX. PROP. CODE § 51.003(b) ("Competent evidence of value may include but is not limited to the following. . . ."). Further, the evidence was legally sufficient to support the trial court's finding that the fair market value of the property on the date of the foreclosure sale for § 51.003 purposes was $477,715.65.

### D. PlainsCapital's Damages

The trial court found PlainsCapital was damaged in the amount of $332,927.27. It based its finding in part on the actual holding and sale costs incurred by PlainsCapital, and by giving credit to Martin for the $599,000 amount for which the bank

---

4. For example, the actual holding costs the trial court found and used—$75,376.41—together with the actual costs of sale it found and used—$45,907.94—totaled over $110,000 less than the bank's anticipated holding and sales costs of $231,000.

sold the property in 2009. The court of appeals reversed that finding and remanded the case to the trial court for determination of the property's fair market value on the foreclosure sale date and for factual findings in support of, among others, the property's fair market value. Those issues should be reconsidered by the court of appeals in light of our holding as to the trial court's discretion to use the future sales price for purposes of § 51.003 fair market value, and in light of Martin's factual sufficiency challenges to the bank's holding and sales costs following the foreclosure sale.

## III. Disposition

PlainsCapital urges that Martin neither properly preserved error in the trial court nor properly briefed and urged issues in the court of appeals as to the factual sufficiency of the evidence to support the trial court findings regarding the bank's holding and sale costs. Martin responds that he did. He prays that in the event we hold the trial court did not err by using the actual holding costs and costs of sale, and that legally sufficient evidence supports its findings as to those costs, then we remand the case to the court of appeals for it to consider his factual sufficiency challenges and other issues that the appeals court did not consider.

We agree with Martin that his factual sufficiency challenges should be remanded to the court of appeals. PlainsCapital may urge its preservation and briefing arguments there.

Because the court of appeals did not consider the merits of Martin's challenges to the trial court's award of attorney's fees to PlainsCapital, we remand that issue to the court of appeals for it to consider in light of its resolution of the other issues being remanded.

The judgment of the court of appeals is reversed. The case is remanded to that court for further proceedings in accordance with this opinion.

Justice Boyd filed a dissenting opinion, in which Justice Guzman joined.

Justice Boyd, joined by Justice Guzman, dissenting.

I agree with the Court that section 51.003 of the Texas Property Code applies in this case. The Court acknowledges the section provides an offset when the foreclosure sales price is less than "the fair market value of the realty as of the date of the foreclosure sale," *ante* at 555 (citing TEX. PROP. CODE § 51.003(b)), but the Court concludes that the trial court properly denied an offset by relying on the price for which the property sold fifteen months after that date. Although I agree that section 51.003 permits the fact-finder to consider evidence relating to a "future sales price," it does so only to the extent that evidence is relevant to determining the property's fair market value as of the date of the foreclosure sale. I do not agree that, by allowing the fact-finder to consider evidence relating to a future sales price, the statute uses the term "fair market value" to mean something other than its commonly understood reference to the amount that a willing buyer would have paid a willing seller. Because the trial court in this case relied on a future sales price without equating that price to the property's fair market value on the date of the foreclosure sale, I would affirm the court of appeals' judgment reversing and remanding the case to the trial court. I therefore respectfully dissent.

## A. Section 51.003 applies.

Section 51.003 addresses situations in which "the price at which real property is sold at a foreclosure sale under Section

51.002 is less than the unpaid balance of the indebtedness secured by the real property, resulting in a deficiency." TEX. PROP CODE § 51.003(a). Although PlainsCapital Bank concedes that it conducted a foreclosure sale under section 51.002, and that the sales price was less than the amount of the secured debt, it contends that section 51.003 does not apply because it is not suing for "the deficiency" that section 51.003 describes. Noting that section 51.003 provides that it governs "any action brought to recover *the* deficiency," *id.* (emphasis added), PlainsCapital contends that the statute does not apply here because it is suing for the difference between the amount of the secured debt and the price for which it later actually sold the property ($599,000), not the price it paid for the property at the foreclosure sale ($539,000).

Based on the text and context of section 51.003, I agree with the Court that the statute applies whenever a lender who conducts a non-judicial foreclosure sale under section 51.002 later pursues an action to recover the deficiency resulting from the sale, regardless of whether the lender elects to apply some credit to that amount. *See Moayedi v. Interstate 35/Chisam Road, L.P.*, 438 S.W.3d 1, 4 (Tex.2014) (explaining that "a deficiency judgment is based on 'the amount of the note, interest and attorney's fees, less the amount received at the trustee sale and other legiti-

mate credits'") (quoting *Tarrant Sav. Ass'n v. Lucky Homes, Inc.*, 390 S.W.2d 473, 475 (Tex.1965)). Section 51.003 expressly refers and relates to "a foreclosure sale under Section 51.002." TEX. PROP. CODE § 51.003(a). Section 51.002, in turn, governs "[a] sale of real property under a power of sale conferred by a deed of trust or other contract lien." *Id.* § 51.002(a). Sections 51.002 and 51.003 impose several mandatory requirements on such a sale,[1] and section 51.003 applies "[i]f the price at which [the] property is sold at [the] foreclosure sale ... is less than the unpaid balance of the indebtedness secured ... resulting in a deficiency." *Id.* § 51.003(a).

In context, I read section 51.003 to contemplate that only one "deficiency" can result from a foreclosure sale under section 51.002, and that any subsequent claim to recover the remaining amount of the debt is necessarily a claim for that deficiency. That is not to say that the only amount that section 51.003 permits a lender to recover is the difference between the secured debt and the foreclosure sales price. To the contrary, the statute expressly provides for credits and offsets that will alter the amount of the deficiency. Section 51.003(d), for example, provides that "[a]ny money received by a lender from a private mortgage guaranty insurer shall be credited to the account of the borrower prior to the lender bringing an

---

1. For example, section 51.002 requires that such a sale "must be a public sale at auction" held at a specific time on a specific day of each month and at a specific location. *Id.* § 51.002(a). Before conducting such a sale, the lender must provide specific notices to the public and to the debtor and must give the debtor an opportunity to cure the default. *Id.* § 51.002(b), (d). Although sections 51.002 and 51.003 do not affect certain kinds of liens, including those "arising under common law, in equity, or under another statute of this state," *id.* § 51.001(2), they otherwise apply to any "sale of real property under a power of

sale conferred by a deed of trust or other contract lien," and their requirements are mandatory as to such a sale. *Id.* § 51.002(a) (requiring that sale "must" be a public sale at auction and "must" be held on at a certain time and date and at a certain location); *see also id.* §§ 51.002(b), (d), (i) (notice "must" be given by a certain date using certain methods and "must" include certain statements); 51.003(a) (suit for deficiency "must" be brought within two years); 51.003(d) (money received from insurer "shall" be credited to borrower's account).

action at law for any deficiency owed by the borrower." And more importantly here, section 51.003(c) requires "an offset against the deficiency" if the property's fair market value at the time of the foreclosure sale exceeded the foreclosure sales price.

Here, the statute allowed PlainsCapital to sue William Martin for the difference between the amount of the debt and the foreclosure sales price ($539,000.00), and the statute permitted Martin to seek an offset in the amount by which the property's fair market value on the date of the foreclosure exceeded the foreclosure sales price. But PlainsCapital chose instead to sue for a lower amount, which was the difference between the amount of the debt and the price for which PlainsCapital sold the property fifteen months after the foreclosure sale ($599,000.00). In effect, PlainsCapital attempted to provide a different kind of offset, in the amount of the difference between the subsequent sale price and the foreclosure sales price. But the statute already accommodates consideration of the subsequent sale price—or more specifically, "the necessity and amount of any discount to be applied to the future sales price"—as evidence to consider when determining the offset based on the property's fair market value at the time of the foreclosure sale. *Id.* § 51.003(b)(5). The statute does not permit the lender to provide an offset based on a "future sales price" and thereby avoid the statute's mandatory requirements any more than it permits the lender to avoid the statute by providing a gratuitous offset of $1, $1,000, or any other arbitrary amount. Under the statute, the "future sales price" on which PlainsCapital sought to rely is relevant only to the determina-

tion of the property's fair market value at the time of the foreclosure sale, and unless "competent evidence of fair market value is introduced, the sale price at the foreclosure sale *shall* be used to compute *the deficiency*." *Id.* § 51.003(c) (emphases added).

Although PlainsCapital contends that it merely sought to benefit the borrower by relying on the future sales price rather than the fair market value to compute the amount of the deficiency, the statute neither contemplates nor permits such an approach. Because section 51.003 applies whenever a lender sues to collect a deficiency following a foreclosure sale under section 51.002 and imposes specific, mandatory requirements to govern such a suit, I agree with the Court that section 51.003 applies to PlainsCapital's claim in this case.

## B. The Meaning of "Fair Market Value"

Although the Court acknowledges that the statute provides an offset based on "the fair market value of the realty as of the date of the foreclosure sale," *ante* at 555 (citing Tex. Prop. Code § 51.003(b)), the Court refuses to equate " 'fair market value' as that term is used in § 51.003 with the historic measure of fair market value." *Ante* at 556.[2] Although the Court acknowledges that "we would ordinarily presume the common meaning of the term applies," *ante* at 556, it concludes that "fair market value" cannot have the common willing-seller/willing-buyer meaning here because the statute allows the fact-finder to consider "forward looking" evidence that is not commonly considered to determine "fair

**2.** The familiar "historic measure" is "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *Ante* at 556 (quoting *City of Harlingen v. Estate of Sharboneau,* 48 S.W.3d 177, 182 (Tex.2001)).

market value." *Ante* at 556. Specifically, because the statute allows the fact-finder to consider evidence of "the necessity and amount of any discount to be applied to the future sales price," the Court concludes that "the term 'fair market value' in § 51.003 does not equate precisely to the common, or historical, definition." *Ante* at 557. Instead, according to the Court, the term "fair market value" means "the historical definition as modified by evidence § 51.003(b) authorizes the trial court to consider in its discretion, to the extent such evidence is not subsumed in the historical definition." *Ante* at 557.

The Court's reasoning on this point is not clear to me. The Court agrees that the statute requires the trial court to "calculat[e] the fair market value as of the date of the foreclosure sale," *ante* at 556, yet the Court holds that the statute permitted the trial court to rely on a future sales price, even though no evidence tied that price to the property's fair market value on the date of the foreclosure sale fifteen months earlier. *Ante* at 559. The Court thus apparently concludes that the statute creates an either/or proposition, such that it allows the fact-finder to determine the offset by deducting the foreclosure sales price from either the historical "fair market value as of the date of the foreclosure sale" or the "future sales price." *Ante* at 552. But the statute refers to the future sales price as "[c]ompetent evidence of value" by which "[t]he fair market value shall be determined," not as an independent alternative to the fair market value. Tex. Prop. Code § 51.003(b). Section 51.003 thus permits the fact-finder to consider a future sales price, but only as evidence of the property's willing-seller/willing-buyer value on the date of the foreclosure sale.

By permitting the court to consider evidence that is not typically relevant to a fair-market-value analysis, the statute simply reflects the nature of foreclosure sales,[3] not a new meaning of "fair market value." The statute expressly requires that the court determine "the fair market value of the real property as of the date of the foreclosure sale," and the evidence regarding the discounted future sales price is permissible only to "arrive at a current fair market value" on that date. Tex. Prop. Code § 51.003(b)(5).

## C. "Discounting" the Future Sales Price

Although the statute refers to a "future sales price," it does so using terms that necessarily tie that price to the property's fair market value on the date of the foreclosure sale. Specifically, the statute provides that "[c]ompetent evidence" of the property's fair market value "may include" evidence of "the necessity and amount of

---

[3]. Specifically, the statute reflects the reality that lenders and other parties who purchase property at a foreclosure sale often intend to sell the property soon thereafter. Because the purpose of foreclosure is to preserve the debt's security by removing it from the party who cannot afford it, "[i]t is the law in Texas that a court may take judicial notice that property is worth more at a private, arms-length sale than at a forced sale under a deed of trust." *Alamo Lumber Co. v. Gold*, 661 S.W.2d 926, 932 (Tex.1983). The buyer at foreclosure, who typically pays below market value because of the dearth of competitive bids, *see, e.g.*, C. Averch & M. Collins, *Avoidance of Foreclosure Sales as Preferential Transfers: Another Serious Threat to Secured Creditors?*, 24 Tex. Tech L. Rev. 985, 990 (1993), typically attempts to recoup its money by reselling the property for at or above market value. In such circumstances, the price for which the property is likely to sell, or in fact has since sold, after the foreclosure sale may assist the fact-finder in determining the property's fair market value on the date of the foreclosure sale. But it does not itself constitute the fair market value on that date.

any discount to be applied to the future sales price or the cashflow generated by the property to arrive at a current fair market value." *Id.*[4] The statute thus permits the fact-finder to consider "the future sales price" only within the context of evidence regarding "the necessity and amount of any discount to be applied to [that price] . . . to arrive at a current fair market value." I thus disagree with the Court's conclusions that "the trial court did not abuse its discretion by calculating the property's fair market value using the $599,000 future sales price [and] not applying a discount to reduce the price further,"[5] *ante* at 558, and that the statute "permitted, but did not require" the trial court to apply a discount to the $599,000 future sales price. *Ante* at 563. The statute did not "require" the trial court to consider the future sales price at all, but because it did, the statute required the trial court to consider that price only with evidence of "the necessity and amount of any discount to be applied" to that price "to arrive at a current fair market value." TEX. PROP CODE § 51.003(b)(5).

We have often recognized that, for purposes of calculating damages, the amount of any future payment must be discounted to reflect its present-day value. *See, e.g.,* *Sheshunoff & Co. v. Scholl,* 564 S.W.2d 697, 698 (Tex.1978) (holding that an award of future salary payments "should have been discounted to its present value at the legal rate of interest"); *Republic Bankers Life Ins. Co. v. Jaeger,* 551 S.W.2d 30, 31 (Tex.1976) (holding that the proper measure of damages was "the present value of all unaccrued payments that the plaintiff would have received if the contract had been performed"); *Pollack v. Pollack,* 39 S.W.2d 853, 858 (Tex. Comm'n App.1931) (holding that, "[i]n computing the present worth of such future payments, same should have been discounted to their present worth at the date of judgment at 6 per cent. interest per annum"). As we explained in *Jaeger,* discounting future damages to their present value "gives the breaching party the benefit of the earning power of his money," and the "proper measure of damages" is thus "a sum which, if invested at a reasonable rate of interest, will yield an annual income from both principal and interest, . . . equal to" the amount the plaintiff would have received. 551 S.W.2d at 31. Thus, "[t]he amount actually awarded will be less than the sum of all future payments because it includes a discount which approximates

---

**4.** The statute's reference to "the cashflow generated by the property" further confirms this point. *Id.* Section 51.003(b)(5) expressly authorizes evidence of "the necessity and amount of any discount to be applied" not only to "the future sales price," but also to "the cashflow generated by the property," as necessary "to arrive at a current fair market value." Similar to the "classic income approach," *see Estate of Sharboneau,* 48 S.W.3d at 183, and our "nuanced approach" to the "subdivision development method," *id.* at 186, the statute's approval of the "discounted cashflow method" in the foreclosure context acknowledges that the amount of money that a buyer at the foreclosure sale will generate from the property in the future may be relevant to the determination of the property's

current fair market value. "No matter what appraisal method an expert uses, however, the goal of the inquiry is always to find the fair market value," and "[a]n appraisal method is only valid if it produces an amount that a willing buyer would actually pay to a willing seller." *Id.* at 183. Thus, evidence of future cashflow, like evidence of a future sales price, is relevant only if the amount is adjusted "to arrive at a current fair market value." TEX. PROP. CODE § 51.003(b)(5).

**5.** For the reasons the Court explains, I agree with its conclusion that the trial court did not abuse its discretion by "deducting PlainsCapital's actual holding costs of $75,376.41 and actual sales costs of $45,907.04." *Ante* at 558.

the earning capacity of [the payor's] money." *Id.*

Section 51.003(b)(5) acknowledges and incorporates a similar principle to determine fair market value in the foreclosure context. Since the statute's goal is to determine the property's value "as of the date of the foreclosure sale," section 51.003(b)(5) does not simply state that the fact-finder may consider evidence of "the future sales price." Rather, it states that the fact-finder may consider evidence of *"the necessity and amount of any discount* to be applied to the future sales price." TEX. PROP. CODE § 51.003(b)(5) (emphasis added). Thus, if a court relies on evidence of a "future sales price," it must make adjustments to that price as necessary "to arrive at a current fair market value" as of the date of the foreclosure sale. *Id.* The future sales price is relevant only to the extent it leads the fact-finder to that amount.

In this case, the trial court did not consider evidence of the necessity or amount of any discount to convert the $599,000 future sales price into the property's fair market value on the date of the foreclosure sale. Some evidence indicated that the fair market value at the time of foreclosure was substantially greater than the $539,000 that PlainsCapital paid, even as high as $825,000 or $850,000.[6] If, in fact, the property was worth a greater amount on the date of foreclosure but subsequently lost substantial value due to a decline in the market, the statute nevertheless re-

quired the court to determine the offset based on the property's fair market value on the date of the foreclosure sale, not its value fifteen months later. Thus, if the court elected to rely on the subsequent sale price, rather than on the other testimony regarding the property's fair market value, the statute required the court to consider any discount or market decline to equate the subsequent sale price to the fair market value on the date of the foreclosure sale. For this reason, I disagree with the Court's assertion that, "if we were to rule the future sales price competent evidence, but only upon a showing of comparable market conditions between the time of the foreclosure sale and the time of the future sale, we would be adding words to § 51.003." *Ante* at 556. The statute focuses solely on the fair market value on the date of the foreclosure sale, so the future sales price is "competent evidence" of that value only if other evidence permits the fact-finder to adjust that price to result in the property's "current market value" on that date.

Here, as the Court notes, the trial court excluded PlainsCapital's evidence of a discount rate to apply to the future sales price, and if the trial court had applied that discount "the result would have been a lesser number for the § 51.003 fair market value finding than the $477,715.65 figure the trial court found, and Martin still would not have been entitled to an offset." *Ante* at 558. But the statute did not permit

---

**6.** Martin presented the testimony of two expert appraisers who concluded that the property's fair market value at the time of foreclosure was $825,000, while Martin testified to his opinion as the property's owner that it was worth $850,000. PlainsCapital's own witness testified that PlainsCapital was prepared to pay up to around $787,000 if other bidders had competed at the foreclosure sale. Shortly before the foreclosure sale, PlainsCapital's broker estimated that the property's

"as is" market value was $770,000 and suggested a "list price" of $799,000, but noted that the "normal marketing time in the area" was 273 days. PlainsCapital determined its $539,000 foreclosure bid price by reducing the $770,000 market value 30% to reflect the fact that the home had been foreclosed on and would be sold without a warranty, and to accommodate for the holding and transaction costs that it would incur to effectuate a subsequent sale.

the trial court to simply rely on the future sales price and subtract holding and sales costs without considering whether and how the future sales price actually established the property's value on the date of the foreclosure sale. As a result, no evidence supports the trial court's conclusion that the property was worth the amount for which it sold fifteen months later. I thus disagree with the Court's holding that the evidence was "legally sufficient to support the trial court's finding that the fair market value of the property ... for § 51.003 purposes was $477,715.65." *Ante* at 558.

In summary, although I agree that section 51.003 applies here and permitted the trial court to consider the property's future sales price, I would hold that the statute required the court to base the amount of the offset only on the property's willing-seller/willing-buyer fair market value as of the date of the foreclosure sale, and permitted the court to consider the future sales price only as evidence leading to the determination of that value. I would therefore affirm the court of appeals' judgment remanding this case to the trial court, and instruct the court that it may consider the $599,000 future sales price only if other evidence enables the court to convert that price into the property's current fair market value as of the date of the foreclosure sale.